**United States District Court**
For the Northern District of California

1

2

3

4

5                    IN THE UNITED STATES DISTRICT COURT

6                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8
MEIJER, INC. & MEIJER DISTRIBUTION,
9   INC.,                                        No. C 07-5985 CW

10          Plaintiffs,                           ORDER DENYING ABBOTT'S
                                                 MOTION TO DISMISS
11      v.                                        (DOCKET NO. 19)

12   ABBOTT LABORATORIES,

13          Defendant.
    ─────────────────────────────────────
14

15   ROCHESTER DRUG COOPERATIVE, INC.,
                                                 No. C 07-6010 CW
16          Plaintiff,
                                                 ORDER DENYING ABBOTT'S
17      v.                                        MOTION TO DISMISS
                                                 (DOCKET NO. 23)
18   ABBOTT LABORATORIES,

19          Defendant.
    ─────────────────────────────────────
20

21   LOUISIANA WHOLESALE DRUG COMPANY,
     INC.,
22                                               No. C 07-6118 CW
            Plaintiff,
23                                               ORDER DENYING ABBOTT'S
        v.                                        MOTION TO DISMISS
24                                               (DOCKET NO. 38)
     ABBOTT LABORATORIES,
25
            Defendant.
26   ─────────────────────────────────────

27

28

1   SAFEWAY INC., et al.,

2           Plaintiffs,                    No. C 07-5470 CW

3       v.                                 ORDER DENYING ABBOTT'S
                                           MOTIONS TO DISMISS
4   ABBOTT LABORATORIES,                   (DOCKET NOS. 24 AND 29)

5           Defendant.

6   ─────────────────────────────────────

7

8   SMITHKLINE BEECHAM CORPORATION d/b/a/
    GLAXOSMITHKLINE,                        No. C 07-5702 CW

9           Plaintiff,                      ORDER DENYING ABBOTT'S
                                           MOTIONS TO DISMISS
10      v.                                  (DOCKET NOS. 44 AND 46)
                                           AND DENYING ABBOTT'S
11  ABBOTT LABORATORIES,                    MOTION TO TRANSFER
                                           (DOCKET NO. 19)
12          Defendant.

13  ─────────────────────────────────────

14

15  RITE AID CORPORATION, et al.,
                                           No. C 07-6120 CW
            Plaintiffs,
16                                         ORDER DENYING ABBOTT'S
        v.                                 MOTION TO DISMISS
17                                         (DOCKET NO. 18)
    ABBOTT LABORATORIES,
18
            Defendant.
19
    ─────────────────────────────────────/
20

21

22       Defendant Abbott Labs moves to dismiss the complaint in each

23  of these related actions, arguing that Plaintiffs' claims for

24  monopolization and attempted monopolization of the market for

25  boosted protease inhibitors are foreclosed by the recent Ninth

26  Circuit case, Cascade Health Solutions v. Peacehealth, 515 F.3d 883

27  (9th Cir. 2008).  Abbott moves separately to dismiss

28  GlaxoSmithKline's (GSK) claims in the SmithKline Beecham case for

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

breach of the implied covenant of good faith and fair dealing, violation of the North Carolina Unfair Trade Practices Act and violation of the North Carolina Prohibition Against Monopolization. Finally, Abbott moves to transfer the SmithKline Beecham case to Illinois. Plaintiffs oppose each of these motions. The matters were heard on March 6, 2008. Having considered oral argument and all of the papers submitted by the parties, the Court denies Abbott's motions.

BACKGROUND

Protease inhibitors (PIs) are considered the most potent class of drugs to combat the HIV virus. In 1996, Abbott introduced Norvir as a stand-alone PI with a daily recommended dose of 1,200 milligrams (twelve 100-mg capsules a day), priced at approximately eighteen dollars per day. Norvir is the brand name for a patented compound called ritonavir.

After Norvir's release, it was discovered that, when used in small quantities with another PI, Norvir would "boost" the anti-viral properties of that PI. Not only did a small dose of Norvir -- about 100 to 400 milligrams per day -- make other PIs more effective and decrease the side effects associated with high doses, but it also slowed the rate at which HIV developed resistance to the effects of those PIs. The use of Norvir as a "booster" has enabled HIV patients to live longer. But the use of Norvir as a booster, and not a stand-alone PI, has also meant that the average daily price of Norvir has plummeted since Norvir was first introduced, because patients need a much smaller daily dose of Norvir when it is used as a booster compared to when it is used as a stand-alone PI. By 2003, the average price for a daily dose of

Norvir was $1.71.

In 2000, Abbott introduced Kaletra, a single pill containing the PI lopinavir as well as ritonavir, which is used to boost the effects of lopinavir. Although effective and widely used, Kaletra causes some patients to experience significant side effects.

In 2003, two new PIs, Bristol-Myers Squibb's Reyataz and GSK's Lexiva, were about to be introduced to the market. Studies showed that, when boosted with Norvir, the new PIs were as effective as Kaletra, and were more convenient. In July, 2003, Reyataz was successfully introduced to the market. As a result, Kaletra's market share fell more than Abbott had anticipated. The average daily dose of Norvir also fell. Before Reyataz's release, the most common boosting dose of Norvir ranged from 200 milligrams to 400 milligrams a day. Clinical trials, however, showed that a Norvir dose of only 100 milligrams a day effectively boosted Reyataz.

On December 3, 2003, Abbott raised the wholesale price of Norvir by 400 percent while keeping the price of Kaletra constant. Abbott contends that it did this so that the price of Norvir would be more in line with the drug's enormous clinical value. Plaintiffs contend that the Norvir price increase was an illegal attempt to achieve an anti-competitive purpose in the "boosted market," which Plaintiffs define as the market for those PIs, such as Reyataz, Lexiva and Kaletra, that are prescribed for use with Norvir as a booster. Plaintiffs sued for, among other things, monopolization and attempted monopolization in violation of the Sherman Act, 15 U.S.C. § 2.

LEGAL STANDARD

I.    Motion to Dismiss

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). On a motion under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests. See Bell Atl. Corp. v. Twombly, __ U.S. __, 127 S. Ct. 1955, 1964 (2007). In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff. NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).

II.   Motion to Transfer

Title 28 U.S.C. § 1404(a) provides, "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The statute itself identifies three factors to consider on a motion to transfer: 1) the convenience of the parties; 2) the convenience of the witnesses; and 3) the interests of justice. 28 U.S.C. § 1404(a). The Ninth Circuit has articulated other considerations that are subsumed in these basic factors, including: the plaintiff's choice of forum; ease of access to the evidence; the familiarity of each forum with the applicable law; the nexus between the forum and the causes of action; the feasability of consolidating other claims; any local interest in the controversy; the relative court congestion and time to trial in each forum; the location where the relevant agreements

5

**United States District Court**
For the Northern District of California

were negotiated and executed; the parties' contacts with the forums; any difference in the costs of litigation between the two forums; and the availability of compulsory process to compel attendance of unwilling non-party witnesses. Decker Coal Co. v. Commonwealth Edison Co., 805 F.2d 834, 843 (9th Cir. 1986); Jones v. GNC Franchising, Inc., 211 F.3d 495, 498-99 (9th Cir. 2000). No single factor is dispositive, and a district court has broad discretion to adjudicate motions for transfer on a case-by-case basis. Stewart Org. Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988); Sparling v. Hoffman Constr. Co., Inc., 964 F.2d 635, 639 (9th Cir. 1988).

DISCUSSION

I.    Cascade's Application to These Cases

A monopolization claim under § 2 of the Sherman Act requires a plaintiff to prove "(1) possession of monopoly power in the relevant market, (2) willful acquisition or maintenance of that power, and (3) causal 'antitrust injury.'" Rutman Wine Co. v. E. & J. Gallo Winery, 829 F.2d 729, 736 (9th Cir. 1987). To demonstrate a claim of attempted monopolization under § 2, the plaintiff must show "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Cascade, 515 F.3d at 893. As the Ninth Circuit has noted, the requirements of both claims are similar, "differing primarily in the requisite intent and the necessary level of monopoly power." Image Technical Servs., Inc. v. Eastman Kodak Co., 125 F.3d 1195, 1202 (9th Cir. 1997).

In the related case, In re Abbott Labs. Norvir Antitrust

6

<u>Litigation</u>, No. C 04-1511, the Court permitted the plaintiffs to proceed on a theory of monopoly leveraging, as articulated in <u>Kodak</u>. Under this theory, "a monopolist who acquires a dominant position in one market through patents and copyrights may violate § 2 if the monopolist exploits that dominant position to enhance a monopoly in another market." <u>Id.</u> at 1216.[1] Here, Plaintiffs allege that Abbott has exploited its monopoly over the "booster market," which is comprised only of Norvir, to seek a monopoly over the "boosted market," which is comprised of drugs intended for use with Norvir as a booster.

As noted above, Abbott has filed an omnibus motion to dismiss based on the Ninth Circuit's recent decision in <u>Cascade</u>. <u>Cascade</u> addresses the issue of when bundled discounts can be considered anticompetitive conduct in violation of the Sherman Act.[2] As the court explained:

---

[1] Abbott argues that Federal Circuit law bars Plaintiffs' reliance on a monopoly leveraging theory, citing <u>In re Independent Service Organizations Antitrust Litigation</u>, 203 F.3d 1322 (Fed. Cir. 2000), in support of its position. According to Abbott, the scope of its rights depends on the resolution of a substantial question of federal patent law, and therefore the Federal Circuit has jurisdiction over any appeal. The Court considered and rejected this argument in <u>In re Abbott Labs. Norvir Antitrust Litigation</u>, and it adheres to that decision. <u>Kodak</u> clearly touched upon the limits of a patentee's rights, and yet the Ninth Circuit crafted a rule as a matter of federal antitrust law, based on Supreme Court precedent. To the extent Federal Circuit law interprets that same precedent in a way that would warrant dismissal of Plaintiffs' claims (and it is not clear that <u>Independent Service Organizations</u> would in fact require dismissal), the Court will follow the Ninth Circuit because those claims arise under the Sherman Act, not federal patent law.

[2] Exclusionary bundled pricing is not necessarily mutually exclusive with a monopoly leveraging theory; bundled pricing can serve as the means by which a plaintiff exploits its monopoly in one market to enhance its monopoly in another market. Thus, both <u>Kodak</u> and <u>Cascade</u> hypothetically could apply at the same time.

**United States District Court**
For the Northern District of California

> Bundling is the practice of offering, for a single price, two or more goods or services that could be sold separately.  A bundled discount occurs when a firm sells a bundle of goods or services for a lower price than the seller charges for the goods or services purchased individually. . . . Bundled discounts are pervasive, and examples abound.  Season tickets, fast food value meals, all-in-one home theater systems -- all are bundled discounts. . . . The varied and pervasive nature of bundled discounts illustrates that such discounts transcend market boundaries.  On the one hand, the world's largest corporations offer bundled discounts as their product lines expand with the convergence of industries.  On the other hand, a street-corner vendor with a food cart -- a merchant with limited capital -- might offer a discount to a customer who buys a drink and potato chips to complement a hot dog.  The fact that such diverse sellers offer bundled discounts shows that such discounts are a fundamental option for both buyers and sellers.

Cascade, 515 F.3d at 894-95.

"Bundled discounts generally benefit buyers because the discounts allow the buyer to get more for less."  Id. at 895.  However, under some circumstances, bundled discounts can be anticompetitive and run afoul of the antitrust laws.  This may happen where a firm "enjoys a monopoly on one or more of a group of complementary products, but [] faces competition on others."  Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc., 920 F. Supp. 455, 467 (S.D.N.Y. 1996).  The competitor who sells only one product in the bundle, even while producing that product at a lower cost than the monopolist, still "might not be able to match profitably the price created by the multi-product bundled discount.  This is true even if the post-discount prices for both the entire bundle and each product in the bundle are above the seller's cost."  Cascade, 515 F.3d at 896 (citation omitted).

The Ortho court gave an example, which the Cascade decision quotes in its entirety, of how this might happen:

8

Assume for the sake of simplicity that the case involved the sale of two hair products, shampoo and conditioner, the latter made only by A and the former by both A and B. Assume as well that both must be used to wash one's hair. Assume further that A's average variable cost for conditioner is $2.50, that its average variable cost for shampoo is $1.50, and that B's average variable cost for shampoo is $1.25.  B therefore is the more efficient producer of shampoo. Finally, assume that A prices conditioner and shampoo at $5 and $3, respectively, if bought separately but at $3 and $2.25 if bought as part of a package.  Absent the package pricing, A's price for both products is $8. B therefore must price its shampoo at or below $3 in order to compete effectively with A, given that the customer will be paying A $5 for conditioner irrespective of which shampoo supplier it chooses.  With the package pricing, the customer can purchase both products from A for $5.25, a price above the sum of A's average variable cost for both products. In order for B to compete, however, it must persuade the customer to buy B's shampoo while purchasing its conditioner from A for $5.  In order to do that, B cannot charge more than $0.25 for shampoo, as the customer otherwise will find A's package cheaper than buying conditioner from A and shampoo from B.  On these assumptions, A would force B out of the shampoo market, notwithstanding that B is the more efficient producer of shampoo, without pricing either of A's products below average variable cost.

Id. at 896-97 (quoting Ortho, 920 F. Supp. at 467).

Thus, "a bundled discounter can exclude rivals who do not sell as great a number of product lines without pricing its products below its cost to produce them," thereby "achiev[ing] exclusion without sacrificing any short-run profits." Id. at 897. For this reason, the test set forth by the Supreme Court to identify illegal predatory pricing in the sale of a single product is not directly applicable to bundled discount cases; that test requires the plaintiff to show that the defendant's low prices are below its incremental costs -- in other words, that the defendant is selling the product at a loss in order to drive out competition. See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222 (1993).

**United States District Court**
For the Northern District of California

Faced with this difficulty, the <u>Cascade</u> court developed a test to determine when bundled pricing is anticompetitive. After considering various alternatives, the court settled on a "discount attribution" standard:

> Under this standard, the full amount of the discounts given by the defendant on the bundle are allocated to the competitive product or products. If the resulting price of the competitive product or products is below the defendant's incremental cost to produce them, the trier of fact may find that the bundled discount is exclusionary for the purpose of § 2. This standard makes the defendant's bundled discounts legal unless the discounts have the potential to exclude a hypothetical equally efficient producer of the competitive product.

<u>Cascade</u>, 515 F.3d at 906. The court believed this standard was in line with the Supreme Court's direction in <u>Brooke</u> and other cases that low prices, which generally benefit the consumer, should not be condemned unless they are below some measure of the defendant's cost.

The <u>Cascade</u> court explained how its rule would apply to the shampoo example: The entire discount on the package of products, $2.75, is subtracted from the $3 price of the competitive product, shampoo, when bought separately. The resulting effective price of the shampoo is thus $0.25, well below A's incremental cost of producing it, $1.50. Accordingly, "A's pricing practices exclude potential competitors that could produce shampoo more efficiently than A (i.e., at an incremental cost of less than $1.50)" but who are unable to produce shampoo at an incremental cost of $0.25. <u>Id.</u> at 906 n.15. A's bundled discount therefore could be considered exclusionary.

After deciding on the discount attribution rule, the court then turned to the appropriate measure of "incremental costs" in a

10

**United States District Court**
For the Northern District of California

bundled discount case.  It noted that there are several possible

methods of measuring costs:

> [F]irms face both fixed costs -- costs that a firm must
> bear regardless of the amount of output -- and variable
> costs -- costs that change with the amount of output.
> The sum of fixed and variable costs is a firm's total
> cost.  Marginal cost is the increase to total cost that
> occurs as a result of producing one additional unit of
> output.  Average cost is the sum of fixed costs and total
> variable costs, divided by the amount of output.

Id. at 909.

The court expressed its approval of the view of Professors

Areeda and Turner, set out in their classic law review article,

that marginal cost -- defined as "the cost to produce one

additional unit and the price that would obtain in the market under

conditions of perfect competition" -- is the "optimal measure of a

firm's costs in a predatory pricing case."  Id.; see also Phillip

Areeda & Donald F. Turner, Predatory Pricing and Related Practices

Under Section 2 of the Sherman Act, 88 Harv. L. Rev. 697, 712, 716

(1975).  Practically speaking, however, it is often not possible to

determine the marginal cost from a firm's accounting practices.

Accordingly, the average variable cost, which is more easily

determined, must serve as a surrogate for the marginal cost.  The

Cascade court held, therefore, that average variable cost is the

appropriate measure of incremental costs for the bundled pricing

standard.  Id.

The central question raised by Abbott's omnibus motion is

whether Cascade's rule applies in the context of these cases, such

that Plaintiffs must show that the imputed price of lopinavir (the

competitive product) in Kaletra is below Abbott's average variable

cost of producing it.

11

**United States District Court**
For the Northern District of California

As an initial matter, it is far from clear that Abbott's sale of Kaletra represents a bundled discount. Consumers do not purchase Kaletra because it provides them with a way to save on two products they would otherwise have to purchase separately. In fact, it is not readily apparent that Kaletra consists of two products at all -- ritonavir and lopinavir are combined in a single pill. Abbott does not offer lopinavir for sale independently of ritonavir; lopinavir is not licensed by the FDA for use except as part of Kaletra. Thus, it is not possible for Abbott to offer an actual discount on lopinavir when sold as part of Kaletra.

Abbott's marketing of Kaletra reveals that Abbott itself does not treat the drug as a package of multiple products -- it is offered in an "all or nothing" form. In fact, Abbott's expert in In re Abbott Labs. Norvir Antitrust Litigation explicitly argues in his rebuttal report that a bundled discount theory does not apply to Abbott's pricing structure -- the relevant heading is entitled, "Abbott does not offer bundled discounts, nor is the challenged pricing structure economically equivalent to bundled discounts." Pls.' Req. For Judicial Notice Ex. 1 at 18.[3] Abbott's expert states:

> In the case of Abbott, a bundled discount would require that Abbott provide a significant discount on Norvir contingent on the patient also purchasing lopinavir. However, Abbott does not offer such discounts on Norvir for patients that purchase lopinavir. Nor does it sell lopinavir as a stand-alone PI. Rather, Abbott's pricing structure, according to Prof. Greer, is a high price of Norvir and a "too low" price of Kaletra.

Id.

---

[3]The Court grants Plaintiffs' request for judicial notice of this portion of the expert rebuttal report.

United States District Court
For the Northern District of California

Even if Kaletra represents a bundled discount such that these cases fall within the general purview of Cascade, it does not follow that the Court must mechanically apply the Cascade rule regardless of its effect under the circumstances. Cascade itself implicitly acknowledges that some atypical cases may fall outside of the situation where only below-cost pricing will have the effect of inhibiting competition. In discussing the application of Brooke to bundled pricing cases, the Cascade court noted that the Supreme Court has never gone "so far as to hold that in every case in which a plaintiff challenges low prices as exclusionary conduct the plaintiff must prove that those prices were below cost." Cascade, 515 F.3d at 901. Instead, the Ninth Circuit viewed the Supreme Court's opinions as "strongly suggest[ing] that, in the normal case, above-cost pricing will not be considered exclusionary conduct for antitrust purposes." Id. (emphasis added).

Abbott's sale of Kaletra -- if it represents a bundled discount -- is a strong candidate for the exception contemplated by the Ninth Circuit. This is because the stated goal of the Cascade rule -- making unlawful only pricing that would exclude equally efficient competitors from the market -- would not be served by applying the rule here.

To illustrate why this is the case, it is instructive to apply the rule to the facts. Abbott charges $17.14 for 200 milligrams of Norvir, while charging $18.78 for a dose of Kaletra containing the same amount of ritonavir. Norris Dec. (Docket No. 20, Case No. 07-5985) Ex. A at 8.[4] The imputed price of the lopinavir portion

_____

[4]These figures are found in a Health and Human Services letter
(continued...)

13

**United States District Court**
For the Northern District of California

1   of Kaletra is the difference between the two amounts, or $1.64.[5]

2   Therefore, under a straightforward application of the <u>Cascade</u> rule,

3   Abbott's pricing could be found anticompetitive only if its average

4   variable cost of producing lopinavir is greater than $1.64.

5       As the parties note, the cost of manufacturing Kaletra pills

6   is negligible -- most likely only a few cents per pill.[6]  Assuming

7   for the sake of argument that Abbott's average variable cost of

8   producing lopinavir is $0.05, if the <u>Cascade</u> rule applied, Abbott's

9   sale of the drug for $1.64 cannot be an antitrust violation.  In

10  fact, at a hypothetical production cost of $0.05, the <u>Cascade</u> rule

11  would permit Abbott to sell Norvir at a price of up to $18.73.

12      But at such a price, competitors would have to sell an equally

13  effective product for $0.05 or less in order to compete with

14  Kaletra.  Common sense dictates that no newly developed PI could

15  ever be sold profitably at such a price, because the manufacturer

16  _____

17      [4](...continued)
    referred to in the complaint.  The Court uses them for illustrative

18  purposes, not as evidence in support of its decision.

19      [5]Because Abbott does not sell lopinavir separately, the price
    of unbundled lopinavir cannot be used as a starting point for the

20  calculation, as the <u>Cascade</u> rule contemplates will ordinarily be
    done.  Nonetheless, only two variables are required in order to

21  derive the "discounted price" of lopinavir.  To demonstrate this,
    assume that Abbott sells lopinavir separately for price "x."  The

22  cumulative discount represented by Kaletra would then be x + $17.14
    - $18.78, or x - $1.64, all of which must be allocated to the

23  lopinavir portion pursuant to the rule.  Subtracting the discount
    of x - $1.64 from the price of lopinavir, x, results in an imputed

24  discounted price of $1.64.

25      [6]The <u>Meijer</u> Plaintiffs argue that Abbott's average variable
    costs should include more than just the cost of manufacturing; they

26  argue that marketing and promotion costs should also be included.
    This is a valid argument, and would raise the average variable cost

27  above the pennies-per-pill cost of manufacturing.  However, because
    the Court finds that the <u>Cascade</u> rule does not apply, it need not

28  determine whether marketing and similar costs should be considered
    when calculating Abbott's average variable cost.

would never be able to recoup its huge research and development

costs.  If the <u>Cascade</u> rule were applied in this context, it would

stifle competition; even a competitor who could produce an equally

effective drug for only $0.01 per pill would be excluded from the

market.  Thus, as applied here, the <u>Cascade</u> rule does not achieve

its stated goal of prohibiting pricing that results in the

exclusion of equally efficient competitors.  This failure is

attributable to the unique structural characteristics of the

pharmaceutical industry, where fixed costs in the form of

investment in research and development dwarf variable costs.[7]

---

[7]It is notable that <u>Cascade</u> and the law review article on
which it relies are based on the premise that, in a perfectly
competitive market, the market price will equal the marginal cost.
<u>See Cascade</u>, 515 F.3d at 909; Areeda & Turner, <u>supra</u>, at 702.
However, in the pharmaceutical industry, even in a crowded field of
competing drugs, market prices will typically be well above
marginal costs.  <u>See, e.g.,</u> Peter K. Yu, <u>the International
Enclosure Movement</u>, 82 Ind. L.J. 827, 898 n.377 (2007) ("The model
of price-setting in a perfectly competitive market suggests that
prices are based upon marginal costs.  But this model obviously
does not apply for pharmaceuticals, for if they were priced
according to their marginal costs, they would be very inexpensive,
but in the long run no expenditures on R&D would be made.");
Brianna Carignan, <u>Legalizing Importation of Prescription Drugs: The
Economic Implications of the Pharmaceutical Market Access and Drug
Safety Act of 2005</u>, 12 New Eng. J. Int'l & Comp. L. 161, 165 (2005)
("[T]he developer of a drug could never recover its research and
development costs by charging prices near its marginal cost of
production.  The economic purpose of patents is to bar entry of
copy products for the term of the patent, to provide the innovator
firm with an opportunity to price above marginal cost and thereby
recoup R&D expense, in order to preserve incentives for future R&D.
Without patents, generic pharmaceuticals could enter the market
immediately and price at marginal cost because they would not have
any R&D expenses to recover.") (citation, internal quotation marks
and alterations omitted).

      Abbott notes that <u>Cascade</u> involves bundled discounting in the
provision of healthcare services.  Abbott asserts that the
healthcare services industry is one with high fixed costs, and thus
pharmaceutical cases cannot be distinguished from <u>Cascade</u>.
However, while the provision of healthcare services may involve
high fixed costs, variable costs -- including the cost of
compensating medical professionals for their time -- are high as
                                                    (continued...)

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

More fundamentally, using average variable cost as a gauge of anticompetitive pricing leads to an exclusive concern with promoting manufacturing efficiency.  But such a concern is not relevant here, where the goal is to prevent pricing that would exclude new, equally effective PIs from competing with lopinavir, provided those PIs can be developed and introduced at least as efficiently as lopinavir.  The present cases are <u>not</u> concerned with the potential exclusion of equally efficient <u>manufacturers</u> of lopinavir.  Yet the <u>Cascade</u> rule is equipped only to address this latter scenario.[8]

An antitrust doctrine that seeks exclusively to promote the efficient production of pills will not serve to promote the introduction of new medicines to compete with a patented drug.  An appropriate antitrust rule here should have the effect of prohibiting Abbott's pricing practices if a hypothetical equally efficient developer of an equally effective PI would not be able to profit if it introduced that PI to the market at a price of $1.64, the imputed price of lopinavir.  As demonstrated, the average-variable-cost rule does not accomplish that goal.[9]  Accordingly,

---

[7](...continued)
well.  As a result, the healthcare services industry does not exhibit the great disparity between fixed and variable costs found in the pharmaceutical industry.

[8]In contrast, manufacturing efficiency is an appropriate focus when the issue is competition between different manufacturers of a single drug for which the patent has expired.  Accordingly, the <u>Cascade</u> rule would achieve the desired effect when applied in such a case.

[9]It may be possible to adjust the rule to shift the focus away from the marginal cost of manufacturing pills.  For instance, it may be appropriate to require Plaintiffs to show, not that $1.64 is less than Abbott's cost of producing 200 milligrams of lopinavir,
(continued...)

United States District Court
For the Northern District of California

1   the Court concludes that the present cases fall within the

2   exception contemplated by Cascade, and thus Plaintiffs need not

3   allege or show that the imputed price of the lopinavir portion of

4   Kaletra is less than Abbott's average variable cost of producing

5   it.

6   II.  Monopolization of the Boosting Market

7        The Meijer, Rochester and Louisiana Plaintiffs assert a

8   Sherman Act claim that the other Plaintiffs do not: they allege

9   that Abbott illegally monopolized the boosting market by keeping

10  the price of Norvir low, thereby providing little incentive for

11  competitors to develop products to compete with it or technologies

12  to reduce the amount of Norvir that must be used as a boosting

13  agent, then raising prices.  The other Plaintiffs assert only that

14  Abbott monopolized the boosted market.[10]

15       Abbott claims that its patents entitle it to a monopoly in the

16  boosting market.  However, the extent of Abbott's exclusionary

17  _____

18       [9](...continued)
    but that $1.64 is not a profitable price for the sale of a 200-mg
19  dose of lopinavir, taking into account the costs Abbott incurred
    prior to introducing lopinavir to the market.
20       Such a "modified" Cascade rule may be difficult to implement
    in practice.  For instance, if Abbott has already recouped its
21  investment in lopinavir, $1.64 may be a profitable price for it
    today, even if Abbott could not have hoped to recoup its investment
22  by selling lopinavir for $1.64 when it was first introduced to the
    market.  At the same time, asking if $1.64 would have been a
23  profitable price for lopinavir when Abbott first introduced it to
    the market would require the development of complex economic models
24  that depend on variables which may not be readily ascertainable.

25       [10]In their briefs on the present motions, these Plaintiffs
    articulate two theories of antitrust liability that the plaintiffs
26  in In re Abbott Labs Norvir Antitrust Litigation have not asserted.
    Because the complaints in the present cases do not assert separate
27  claims based on these "new" theories, however, the Court need not
    rule on their validity.  The Court thus addresses only whether
28  Plaintiffs may proceed on their claims for monopolization and
    attempted monopolization under the Sherman Act.

1  rights under its patents is not clear from the face of the

2  complaint.  Thus, dismissal of this claim is premature, and

3  Abbott's motion is denied.

4  III. Abbott's Motion to Dismiss GSK's Claims

5      A.   Sherman Act Claims

6      In its order denying Abbott's motion for summary judgment in

7  In re Abbott Labs. Norvir Antitrust Litigation, the Court found

8  that there was a triable issue of fact regarding whether Abbott's

9  patent rights extend beyond the booster market to the boosted

10 market, thereby entitling it to maintain a monopoly over the latter

11 market.  Abbott maintains that, in the SmithKline Beecham

12 complaint, GSK admits that Abbott's patents cover the boosted

13 market, essentially "pleading itself out of court."

14     In support of its argument, Abbott cites the following

15 paragraphs of the complaint:

16     17.  Abbott never sought to use its intellectual property
            to prevent others from selling PIs for
17          administration with Norvir. Instead, it chose to
            profit by licensing competitors the right to market
18          PIs to be co-administered with Norvir.

19     20.  In 2001, Abbott approached GSK to demand that it
            secure a license to allow GSK to promote its
20          existing PIs, as well as PIs it had under
            development, with Norvir. GSK acquiesced to this
21          demand, procuring a license from Abbott in December
            2002.
22
       21.  Under the agreement, Abbott gave GSK the right to
23          promote the use and administration of its PIs with
            Norvir. Abbott knew that GSK's plan was to use the
24          Norvir license in order to promote GSK's PIs in
            boosted form. GSK paid substantial sums of money in
25          consideration for this license.

26     22.  GSK is informed and believes, and therefore alleges,
            that other pharmaceutical companies, including BMS,
27          took similar licenses allowing the promotion of
            their PIs with Norvir during the same timeframe.
28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    36.    Abbott's decision to raise the price of Norvir by
2          400 percent was unprecedented and taken in bad
          faith. The 400 percent price hike immediately after
3          GSK's release of Lexiva dashed GSK's reasonable
          expectation that, by virtue of the license for which
4          it had paid, it would be able to promote the
          co-prescription and co-administration of its PI
5          products with Norvir at prices competitive with
          those of Kaletra and other PIs. . . . .

6    Compl., Case No. C 07-5702.

7        Contrary to Abbott's characterization of these statements,

8    they do not admit or necessarily imply that Abbott has a valid

9    patent covering the entire boosted market.[11]

10       Nor is GSK precluded from asserting its claims by virtue of

11   its license agreement with Abbott, which gives GSK the right to

12   market its own PIs for use with Norvir as a booster.  As this Court

13   has noted previously, a party may choose to obtain a license, even

14   under the belief that the licensed patent is invalid or does not

15   cover the scope claimed by the patentee, in order to avoid the

16   possibility of litigation.  Cf. Medimmune v. Genentech, Inc.,

17   __ U.S. __, 127 S. Ct. 764 (allowing a current licensee to bring an

18   action for a declaratory judgment of noninfringement and

19   invalidity).

20       Abbott also notes that the license contains a recital stating,

21   "Abbott owns certain patents related to the use, marketing and

22   promotion of Ritonavir (as defined below), its protease inhibiting

23   compound (marketed under the trade name Norvir), in combination

24   with other products indicated for the treatment of HIV."  Norris

25   Dec. Ex. A at 1.  This recital, however, does not specify that

26   _____

27        [11]In addition, Abbott's argument presupposes that it will raise
     its patents as an affirmative defense.  Because this defense does
28   not appear clearly on the face of the pleading, dismissal at this
     stage is not appropriate in any event.

United States District Court
For the Northern District of California

Abbott possesses valid patents giving it the rights it now claims over the boosted market.  Even if it did, such a statement would not constitute a binding admission in this litigation, in that it is not a promise comprising a part of the bargained-for exchange that is the subject of the license agreement.

B.    State Law Claims

1.    Breach of the Implied Covenant of Good Faith and Fair Dealing

GSK asserts a claim for breach of the implied covenant of good faith and fair dealing under New York law, which applies pursuant to the choice-of-law provision in the license agreement.  In connection with this claim, GSK asserts that it was deprived of the benefit of the license agreement's bargain when Abbott raised the price of Norvir.  GSK maintains that, when it agreed to pay substantial royalties for the right to market its PIs for use in conjunction with Norvir, it had a "reasonable expectation that Norvir would continue to be commercially available for use as a PI boosting agent and that future increases in the price of Norvir would be consistent with past increases."  SmithKline Beecham Compl. ¶ 64.  When Abbott raised the price of Norvir, GSK claims it acted in bad faith by intentionally "thwart[ing] GSK's ability to benefit from [its] contracted rights."  Id.

Under New York law, "[i]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance."  Dalton v. Educ. Testing Serv., 663 N.E.2d 289, 291 (N.Y. 1995).  Abbott has cited lower court cases from New York holding that a claim for breach of the implied covenant of good faith and fair dealing cannot take the place of a substantively

20

nonviable breach of contract claim, see e.g., Nikitovich v. O'Neal, 836 N.Y.S.2d 34 (App. Div. 2007), and that a claim for the breach of the implied covenant of good faith and fair dealing may not be asserted independently of a breach of contract claim when it is based on the same facts, see, e.g., Cohen v. Nassau Educators Fed. Credit Union, 2006 WL 1540324, at *4 (N.Y. Sup. Ct. 2006). Neither of these is the situation here.

In addition, the New York Court of Appeals has held that a breach of the implied covenant of good faith and fair dealing can itself serve as the basis for a breach of contract claim. In 511 West 232nd Owners Corp. v. Jennifer Realty Co., 773 N.E.2d 496 (N.Y. 2002), the court permitted the plaintiffs to proceed on a breach of contract claim based on their allegation that the offering plan for the conversion of an apartment building into a cooperative included an implied promise by the sponsor to sell all unsold units within a reasonable time. Such a promise was not explicitly contained in the contract. The court held that, "[w]hile the duties of good faith and fair dealing do not imply obligations inconsistent with other terms of the contractual relationship," they do require that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Id. at 500 (internal quotation marks omitted). Accordingly, a party may pursue a breach of contract claim for violation of "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." Id. at 501 (internal quotation marks omitted).

Here, GSK's second cause of action is entitled, "Breach of

**United States District Court**
For the Northern District of California

Covenant of Good Faith and Fair Dealing," not breach of contract.
To the extent Abbott argues that this claim should be dismissed
because it must be stated as a breach of contract claim, its
argument fails.  "The form of the complaint and the label attached
by the pleader are not controlling, and it is enough that the
pleader state the facts making out a cause of action."  Drezin v.
DeLisser, __ N.Y.S.2d __, 2007 WL 2894083, at *4 (Sup. Ct. 2007)
(citing Van Gaasbeck v. Webatuck Cent. School Dist. No. 1, 234
N.E.2d 243 (N.Y. 1967)).  GSK alleges that Abbott undertook an
implied obligation to continue to make Norvir commercially
available and to keep future increases in the price of Norvir in
line with past increases.  Whether Abbott in fact undertook such an
obligation is an issue of fact that is not appropriately determined
on a motion to dismiss.  Because such an implied obligation would
not necessarily be inconsistent with the express terms of the
license agreement, the Court finds that GSK has sufficiently plead
a claim for breach of an implied term of the license agreement.

> 2.  North Carolina Unfair Trade Practices Act and
> Prohibition Against Monopolization

Abbott argues that GSK has failed to state a claim under the
North Carolina Unfair Trade Practices Act, N.C. Gen. Stat.
§ 75-1.1.  To state such a claim, a plaintiff must allege: "(1) an
unfair or deceptive act or practice, or unfair method of
competition, (2) in or affecting commerce, and (3) which
proximately caused actual injury to the plaintiff or his business."
Miller v. Nationwide Mut. Ins. Co., 435 S.E.2d 537, 542 (N.C. Ct.
App. 1993).  The Act is a "comprehensive law designed to include
within its reach the federal antitrust laws."  L.C. Williams Oil

United States District Court
For the Northern District of California

Co., Inc. v. Exxon Corp., 625 F. Supp. 477, 481 (M.D.N.C. 1985).

Accordingly, Sherman Act violations are likely to be actionable

under the Unfair Trade Practices Act.  Additionally, the North

Carolina Act "also sanctions, as part of its broad remedial purpose

of promoting ethical business dealings, commercial 'unfairness' and

'deception' beyond traditional antitrust concepts." Id. (citing

Marshall v. Miller, 276 S.E.2d 397, 403 (N.C. 1981).

North Carolina courts apparently have not addressed whether a

cause of action based on a monopoly leveraging theory may lie under

the Unfair Trade Practices Act.  Accordingly, the Court must

predict how the North Carolina Supreme Court would resolve this

issue.  See Westlands Water Dist. v. Amoco Chem. Co., 953 F.2d

1109, 1111 (9th Cir. 1991).

Abbott argues that the North Carolina Supreme Court would

follow the Seventh Circuit and the Federal Circuit in rejecting

liability under a monopoly leveraging theory.  However, Abbott has

cited no North Carolina case or any other evidence in support of

this contention,[12] and thus has provided no basis for the Court to

apply a different antitrust standard than that which it has applied

to GSK's Sherman Act claim.[13]  In addition, even if the North

---

[12]The only case Abbott cites is a federal case in which the
court predicted that the Fourth Circuit would not find a violation
of § 2 of the Sherman Act based on a monopoly leveraging theory.
Bepco, Inc. v. Allied-Signal, Inc., 106 F. Supp. 2d 814, 833
(M.D.N.C. 2000).  This sheds no light on the question of whether
the North Carolina Supreme Court would accept such a theory under
the Unfair Trade Practices Act.  Moreover, the Bepco court
permitted the plaintiffs to proceed on their claims under the
Unfair Trade Practices Act.

[13]For the same reason, GSK has also stated a claim under the
North Carolina Prohibition Against Monopolization, N.C. Gen. Stat.
§ 75-2.1.

23

United States District Court
For the Northern District of California

1  Carolina Supreme Court would not recognize monopoly leveraging as a

2  form of anticompetitive conduct, GSK has alleged conduct that could

3  be considered "unfair" or "deceptive" under the Act.[14]   Accordingly,

4  GSK may proceed on its claim.

5  IV.  Abbott's Motion to Transfer the SmithKline Beecham Case

6        Abbott seeks to transfer the SmithKline Beecham case to

7  Illinois.  It is true that the only apparent connection between the

8  case and California is that California is home to a large number of

9  HIV-positive individuals who may be consumers of boosted PIs.

10 However, this case has no greater connection to Illinois, except

11 that Illinois is the site of Abbott's headquarters.  Illinois thus

12 has no particular interest in this case other than the generalized

13 interest in ensuring that its citizens receive fair adjudications.

14       While Abbott claims that transferring the case to Illinois

15 would be more convenient for it, this claim is undercut by the fact

16 that Abbott would continue to have to defend itself in the related

17 cases still before this Court, while defending itself in a new

18 forum as well.  Moreover, GSK apparently finds California to be a

19 convenient forum, and it would not be appropriate to transfer this

20 case on convenience grounds when the effect would be simply to make

21 the litigation more convenient for one party at the expense of the

22 _____

23       [14]Abbott argues that, in order for a claim for deceptive
   behavior to lie, there must be detrimental reliance upon a
24 statement or misrepresentation, citing Business Cabling, Inc. v.
   Yokeley, 643 S.E.2d 63, 36 (N.C. Ct. App. 2007), in support of its
25 position.  Yokeley, however, was concerned with determining whether
   the plaintiff had established causation between the deceptive acts
26 and a compensable injury.  No such issue is present here.  In
   addition, another North Carolina appeals court has held that actual
27 reliance on a misrepresentation is not required.  See Cullen v.
   Valley Forge Life Ins. Co., 589 S.E.2d 423, 431 (N.C. Ct. App.
28 2003).

**United States District Court**
For the Northern District of California

1   other party.  See <u>STX, Inc. v. Trik Stik, Inc.</u>, 708 F. Supp. 1551,

2   1556 (N.D. Cal. 1988); <u>Decker Coal</u>, 805 F.2d at 843.

3        Additionally, it would not be in the interest of justice to

4   transfer this case because it would needlessly splinter the

5   litigation.  Nor has Abbott shown that the availability of

6   witnesses or evidence will be an issue if the case continues in

7   this District, particularly considering that the related cases will

8   continue before the Court whether <u>SmithKline Beecham</u> is transferred

9   or not.  As for Abbott's charge that GSK has engaged in forum

10  shopping, it appears equally likely that Abbott is engaging in

11  similar conduct; by litigating the case in Illinois, Abbott would

12  be able to rely on Seventh Circuit precedent, which is more

13  favorable to Abbott than Ninth Circuit precedent.

14       Accordingly, the Court declines to exercise its discretion to

15  transfer this case to Illinois.

16                            CONCLUSION

17       For the foregoing reasons, Abbott's motions to dismiss are

18  DENIED.  Abbott's motion to transfer the <u>SmithKline Beecham</u> case is

19  also DENIED.

20       IT IS SO ORDERED.

21

22  Dated:  4/11/08

23                              _____
                                CLAUDIA WILKEN
                                United States District Judge

24

25

26

27

28